UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

PATRICIA CARUSO,

                Plaintiff,

   - against -

NANCY GRACE,

                Defendant.

------------------------------------------------- X

**OPINION AND ORDER**

**11 Civ. 2353 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/27/11

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

      Patricia Caruso, a veteran of the entertainment industry, brings this

diversity action against Nancy Grace, a legal analyst and television series host,

alleging breach of contract.  Caruso's allegations arise out of an oral contract

between Caruso and Grace that Grace would refrain from proceeding with a

television series unless Caruso were offered the role of executive producer, and

Grace's subsequent alleged breach of that agreement in proceeding with the show.

      Before the Court are (1) Grace's motion to dismiss asserting that the

alleged contract is defective as a matter of law because (a) it violates the statute of

frauds since it could not be performed within one year; (b) it violates the statute of

frauds because it involved a contract to pay for the negotiation of a business opportunity; (c) it is indefinite with respect to its material terms; and (2) Grace's motion for sanctions on the grounds that this action is frivolous.  For the reasons discussed below, Grace's motions are denied.

## II.    BACKGROUND[1]

### A.    The Parties and Their History

Patricia Caruso has worked in the entertainment industry for three decades and is the founder of Ashwells Entertainment, a production and public relations firm.[2]  Nancy Grace is a former attorney and the host of two television shows, a nightly legal analysis series on Headline News, a division of CNN, and *Swift Justice with Nancy Grace* ("*Swift Justice*"), a syndicated television series.[3] Caruso and Grace first met while both worked for the cable television channel Court TV.[4]  Since that time Caruso and Grace have been personally and professionally friendly.[5]

---

[1]    The facts in this case are taken from Caruso's Complaint ("Compl.") and assumed to be true for the purposes of this motion.

[2]    *See* Compl. ¶ 7.

[3]    *See id.* ¶ 8.

[4]    *See id.* ¶ 11.

[5]    *See id.* ¶ 12.

While Grace was working for CNN her contract came up for renewal in 2006-07.[6] During the negotiations, Caruso advised Grace to insist on a "carve-out" provision that would permit her to appear on a syndicated television series.[7] Caruso explained the financial possibilities that such an opportunity would provide, and Grace ultimately asked for and received a "carve-out" provision in her CNN contract.[8] After that time Caruso and Grace frequently discussed the possibility of collaborating on a syndicated television series, and Grace explored some possibilities on her own.[9] Neither these talks nor Grace's explorations led to anything.[10]

### B.    The Contract

In early 2008, Caruso and Grace had a lunch meeting in Manhattan to discuss collaborating on a law-themed syndicated television series featuring Grace.[11] At the meeting Caruso described her idea for a possible series entitled

---

[6]    *See id.* ¶ 14.

[7]    *See id.*

[8]    *See id.*

[9]    *See id.* ¶ 15.

[10]    *See id.*

[11]    *See id.* ¶¶ 12-17.

*Grace's Cases*.[12]  The show would be a law-themed syndicated television series in which Grace would help individuals pursue and resolve their legal issues.[13]  Caruso and Grace then discussed potential alternative formats and the current market for such a series.[14]

Following these discussions, Caruso and Grace reached an agreement (the "Agreement") containing the following specific provisions regarding their intention to work together on a law-themed syndicated television series:

> Caruso agreed:
> a) To develop and/or assist in the development of a concept for a law-themed syndicated series featuring Grace (the "Series").
> b) To market the Series to appropriate buyers or financiers, including broadcast television networks.
> c) To serve as an executive producer to the Series. . . .
>
> Grace specifically agreed:
> a) To cooperate in the development, production, and marketing of the Series, including attaching her name to the Series and attending meetings to market and sell the Series.
> b) To proceed with the Series only in the event that Caruso were retained and credited as an executive producer.
> c) To host the Series.[15]

The positions of "executive producer" is uniformly recognized in the television

---

[12]   *See id.* ¶ 18.

[13]   *See id.*

[14]   *See id.* ¶¶ 18-19.

[15]   *Id.* ¶¶ 19-21.

4

industry, and both parties understood this at the time of their Agreement.[16]  The

position involves a variety of duties including involvement in developing the

format and look of the series, marketing and publicity for the series, selecting a

"show runner," selecting and overseeing a production team, supervising selection

of supplemental cast and overseeing production of individual segment concepts,

including booking guests.[17]

The Agreement did not just pertain to the treatment for *Grace's*

*Cases*.[18]  Though Caruso and Grace intended to propose *Grace's Cases* to network

executives, they understood that "another format could prove more attractive."[19]

Therefore, they agreed that the Agreement "covered the Series in whatever format

gained traction in the market."[20]  In other words, the Agreement was intentionally

made broad enough to cover any other format that the idea for their series might

take if and when it became a syndicated series.[21]

**C.    Early Efforts to Create and Sell the Series**

---

[16]    *See id.* ¶ 22.

[17]    *See id.*

[18]    *See id.* ¶ 23.

[19]    *Id.*

[20]    *Id.*

[21]    *See id.*

After making the Agreement, Caruso began working on the treatment for *Grace's Cases* by (1) reviewing and discussing numerous versions of the treatment with Grace; (2) contacting Eric Schotz, the President and CEO of LMNO Productions, to assess industry interest; (3) meeting with Schotz and Grace to discuss trying to sell the show; (4) contacting William Morris Agency and Endeavor Talent Agency to enroll a talent agency to represent Caruso and Grace; and (5) enlisting the assistance of Shannon Murphy, CEO of Encounter Studios, to pitch *Grace's Cases* to CBS in Los Angeles.[22]  Between the making of the Agreement and October 2008, Caruso and Grace exchanged dozens of communications, including in-person meetings, about evolving concepts for their Series idea.[23]

**D.    The CBS Pitch**

In December 2008, Caruso instructed Murphy to meet with Abra Potkin, CBS's Vice President of Programming and Development, and present a treatment for *Grace's Cases*.[24]  Murphy conducted the meeting and then informed Caruso that CBS had responded enthusiastically about the treatment and wanted to

---

[22]     *See id.* ¶¶ 25-28.

[23]     *See id.* ¶ 29.

[24]     *See id.* ¶ 31.

pursue the series.[25]  In followup conversations between Caruso, Grace and Murphy,

Grace requested that Dean Sicoli be added to the team.[26]  Grace then asked her

attorney, Lawrence Shire, to contact Caruso to discuss the status of a CBS

contract.[27]  Caruso informed Shire that CBS wanted to meet Grace before making a

formal offer.[28]  Caruso also informed Grace that CBS might have its "own idea" for

the syndicated series.[29]

      A personal meeting between Grace and CBS representatives, Potkin

and Terry Wood, President of Creative Affairs and Development, was held on

January 13, 2009.[30]  Before the meeting, Murphy informed CBS that Caruso would

attend as the Series' executive producer.[31]  Caruso, Grace, and Sicoli attended this

meeting, as did Jim Kellem, representing Shannon Murphy.[32]  At the meeting

CBS's Wood informed the group that they were not interested in the *Grace's*

---

[25]    *See id.* ¶ 32.

[26]    *See id.*

[27]    *See id.*

[28]    *See id.*

[29]    *See id.* ¶ 34.

[30]    *See id.* ¶ 33.

[31]    *See id.*

[32]    *See id.*

*Cases* format for the series, but they were interested in a similar series featuring half-hour segments in the courtroom genre, with Grace resolving cases as a judge.[33] The parties present discussed the range of cases that might be presented in that format, and Grace informed CBS that Caruso would take the lead on communicating with the network for the next development meeting.[34]  These discussions led to the emergence of *Swift Justice*.[35]  Following the January 13 meeting and over the next year, Grace "repeatedly and consistently affirmed" the Agreement, "with the promise of Caruso becoming executive producer of the Series regardless of the Series format."[36]

On January 27, 2009, Caruso and Grace agreed that Sean Perry of Endeavor Talent Agency would represent them in negotiations with CBS.[37]  In a telephone call that day, Grace told Caruso that she would never do any syndicated series without her.[38]  Perry contacted CBS's Wood to confirm that he would

---

[33]     *See id.* ¶ 35.

[34]     *See id.* ¶¶ 36-37.

[35]     *See id.* ¶ 38.

[36]     *Id.* ¶ 39.

[37]     *See id.* ¶ 41.

[38]     *See id.* ¶ 40.

represent "Nancy, Dean and Patty."[39]  Grace sent an e-mail to Caruso, Perry and Potkin expressing her hope that they could come up with a great show and that all further CBS communications should come though Caruso.[40]  On January 29, 2009, in response to rumors that CBS wanted Caruso out of any deal with Grace, Grace stated through her attorney "it's the opposite — I will not do any deal without Patty."[41]  Between January 29 and March 17, Grace continually assured Caruso that she would handle CBS on behalf of Caruso and that Grace would insist on "[Caruso] and Dean [Sicoli] as EPs on the show."[42]  Between April and May 2009, Caruso also instructed Perry to pitch the Series to other networks such as NBC and Fox in case CBS did not make a formal offer.[43]  Grace, Caruso and Sicoli participated in all these pitches as a team.[44]

### E.   The CBS Offer

In May 2009, CBS made Grace an offer to shoot a pilot for the

---

[39]   *Id.* ¶ 41.

[40]   *See id.* ¶ 42.

[41]   *Id.* ¶ 43.

[42]   *Id.* ¶¶ 44-46.

[43]   *See id.* ¶ 47.

[44]   *See id.*

Series.[45]  Grace reported this development to Caruso, and Grace and Caruso

discussed the content of the Series up to and through the shooting of the pilot.[46]

During that time-period, Grace told Caruso repeatedly that she would not sign a

contract without Caruso in place as executive producer.[47]  On September 14, 2009,

Grace instructed her attorney, "Before I sign deal [sic] I hav[e] to have . . . patty in

place . . . We said [we'd] wait til the end and here it is."[48]  Likewise on September

25, 2009, Caruso's attorney stated to Grace's attorney that Caruso expected to be

credited and compensated as an executive producer in accordance with the

Agreement.[49]  In response Grace's attorney confirmed to Caruso's attorney that

Grace's and Caruso's expectations would be met, and stated that Grace had "gone

to bat for Patty [in negotiations with CBS] in a huge way."[50]

On September 29, 2009, Grace's attorney informed Caruso's attorney

that Grace had no contractual relationship with Caruso and was only acting "out of

---

[45]     *See id.* ¶ 48.

[46]     *See id.*

[47]     *See id.* ¶ 49.

[48]     *Id.*

[49]     *See id.* ¶ 50.

[50]     *Id.*

10

friendship."[51]  Alarmed, Caruso contacted Grace who contradicted her attorney and told Caruso that she did not want Caruso out of the deal, but that it was too early to press CBS on the executive producer role.[52]  In October 2009, both Grace and Caruso flew out to California for several days of meetings as well as the taping of the pilot.[53]  Grace paid for Caruso to fly out, and Caruso took an active role in the pilot shooting where Grace reaffirmed the Agreement.[54]

On December 2, 2009, the news broke that CBS had sold *Swift Justice* to eighty percent of the U.S. syndicated television market.[55] After the announcement, Grace, Caruso and their husbands went out for a celebratory dinner where they discussed their plans for the show.[56]  Grace then sent Caruso communications indicating that Grace would honor the Agreement, and Grace did not disagree when Caruso articulated her expectation that she and Sicoli would be credited and compensated as "co-executive producers."[57]  During the following

---

[51]     *Id.* ¶ 51.

[52]     *See id.*

[53]     *See id.* ¶ 52.

[54]     *See id.* ¶¶ 52-54.

[55]     *See id.* ¶ 55.

[56]     *See id.* ¶ 56.

[57]     *Id.* ¶¶ 57-58.

weeks, Grace and Caruso continued to communicate, and Grace reassured Caruso explicitly that she would not be cut from the team and that she would be executive producer.[58]  On January 14, 2010, Grace e-mailed Caruso stating, "It is going to work!!!"[59]

### F.    Grace's Breach of the Agreement

On February 8, 2010, Caruso was told for the first time by Potkin that CBS was not interested in retaining Caruso as executive producer of *Swift Justice*.[60]  Potkin further informed Caruso that Grace had not insisted on Caruso's role as executive producer in negotiations with CBS.[61]  On March 5, 2010, CBS offered Caruso a position on *Swift Justice* entitled "Executive, Talent and Audience Relations," a year-long position with compensation of $100,000 and the possibility of a renewal.[62]  This position involved different duties than the position of executive producer.[63]

In the Spring of 2010 Grace agreed to host *Swift Justice* even though

---

[58]     *See id.* ¶¶ 59-62.

[59]     *Id.* ¶ 63.

[60]     *See id.* ¶¶ 67-68.

[61]     *See id.* ¶ 68.

[62]     *See id.* ¶ 69.

[63]     *See id.*

CBS refused to make Caruso an offer to join as executive producer.[64]  The show launched in the Fall of 2010 and debuted as the highest rated new syndicated television series of the Fall 2010 season.[65]  Because Caruso was not brought on the show as executive producer she lost out on the compensation that she would have received in that position.[66]  The customary compensation for executive producers in the entertainment industry includes ten percent of the show budget per week and ten percent of the modified adjusted gross revenue for the life of the television series.[67]  Caruso projects that for *Swift Justice* these figures may reasonably add up to fifteen million dollars.[68]  Caruso also complains that by breaching the Agreement, Grace caused Caruso to lose out on "industry-recognized credit" as executive producer of a highly successful syndicated television series.[69]

Caruso commenced this action on March 8, 2011, in New York State Supreme Court in New York County alleging one count of breach of contract and seeking damages of at least fifteen million dollars as well as punitive damages,

[64]     *See id.* ¶ 66.

[65]     *See id.* ¶ 72.

[66]     *See id.* ¶ 75.

[67]     *See id.*

[68]     *See id.* ¶¶ 75-78.

[69]     *Id.* ¶ 79.

attorney's fees and interest.[70]  Grace filed a Notice of Removal on April 6, 2011, to

remove this action to the United States District Court in the Southern District of

New York.[71]  Grace's Notice of Removal was based on diversity of citizenship as

Caruso is a citizen of New York, Grace is a citizen of Georgia and the amount in

controversy exceeds $75,000.[72]  Grace now moves to dismiss the Complaint on the

grounds of failure to state a claim upon which relief can be granted.  In addition,

Grace has filed a motion for sanctions claiming that the present action is frivolous.

## III.  LEGAL STANDARD

### A.  Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), the court evaluates the sufficiency of the complaint under the

"two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal.*[73]

*First*, a court "'can choose to begin by identifying pleadings that, because they are

no more than conclusions, are not entitled to the assumption of truth.'"[74]

---

[70]     *See id.* ¶¶ 80-87.

[71]     *See* Notice of Removal of Action Under 28 U.S.C. §§ 1332 and 1441.

[72]     *See id.*; *see also* 28 U.S.C. § 1332.

[73]     556 U.S. —, 129 S. Ct. 1937, 1950 (2009).

[74]     *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1950).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[75]  *Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[76]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[77]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[78]  Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[79]

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents

---

[75]    *Iqbal*, 129 S. Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[76]    *Id.* at 1950.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[77]    *Twombly*, 550 U.S. at 564.

[78]    *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[79]    *Id.* (quotation marks omitted).

incorporated by reference in the complaint."[80]  However, the court may also

consider a document that is not incorporated by reference, "where the complaint

'relies heavily upon its terms and effect,' thereby rendering the document 'integral'

to the complaint."[81]

### B.    Motion For Sanctions

An attorney may only assert "claims, defenses, and other legal

contentions [that] are warranted by existing law or by a nonfrivolous argument for

extending, modifying, or reversing existing law or for establishing new law."[82]  A

court may impose sanctions for violations of Rule 11 if such sanctions are "limited

to what suffices to deter repetition of the conduct or comparable conduct by others

similarly situated."[83]  "[D]istrict courts retain broad discretion in fashioning

sanctions."[84]  "The fact that a legal theory is a long-shot does not necessarily mean

it is sanctionable.  The operative question is whether the argument is frivolous, i.e.,

---

[80]      *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[81]       *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[82]      Fed. R. Civ. P. 11(b).

[83]      *Id.* 11(c).

[84]      *Eastway Constr. Corp. v. City of N.Y.*, 762 F.2d 243, 254 (2d Cir. 1985).

the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" [85]

## IV.   APPLICABLE LAW[86]

### A.   Breach of Contract

To make out a breach of contract claim under New York law a plaintiff must show "'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"[87]  A plaintiff alleging a breach of contract claim is required only to provide a defendant with a "short, plain notice" of the claims against it pursuant to Rule 8.[88]  However, a breach of contract claim "that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to

---

[85]   *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) (quoting *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) and *Morley v. Ciba–Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995)).

[86]   Both parties' briefs assume that New York State law controls this dispute, and the Court proceeds accordingly.  *See Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

[87]   *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

[88]   *See Contractual Obligation Prods., LLC v. AMC Networks, Inc.*, No. 04 Civ. 2867, 2006 WL 6217754, at *19 (S.D.N.Y. Mar. 31, 2006) (citing *Weiss v. La Suisse*, 69 F. Supp. 2d 449, 462 (S.D.N.Y. 1999)).

17

dismissal."[89]

Under New York law, "before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."[90]

> The doctrine of definiteness or certainty is well established in contract law.  In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to . . . .  [I]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract.[91]

However, "[b]efore rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear."[92]

### B.    Statute of Frauds

"Consideration of the Statute of Frauds as an affirmative defense is

---

[89]    *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (quotation marks omitted).

[90]    *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981).

[91]    *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 609 (S.D.N.Y. 2010) (quotation marks and citations omitted).  *Accord GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 326 (S.D.N.Y. 2009).

[92]    *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989).

appropriate on a motion to dismiss, as such a motion is intended to weed out

meritless claims, avoiding needless efforts on the parts of the parties and the Court

and avoiding needless discovery."[93]  The statute of frauds "was intended to prevent

fraud in the proving of certain legal transactions particularly susceptible to

deception, mistake and perjury."[94]  Regarding "the requirement for a signed writing

for a contract not to be performed within one year, the design of the statute was,

not to trust to the memory of witnesses for a longer time than one year."[95]

Under New York law "[e]very agreement, promise or undertaking is

void, unless it or some note or memorandum thereof be in writing, and subscribed

by the party to be charged therewith, or by his lawful agent, if such agreement,

promise or undertaking . . . [b]y its terms is not to be performed within one year

from the making thereof."[96]

> [I]t is not the meaning of the statute that the contract must be
> performed within a year.  If it can be so performed consistently
> with the language in which the parties have expressed themselves,
> in other words, *if the obligation of the contract is not, by its very*

---

[93]     *Zeising v. Kelly*, 152 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (citations omitted).

[94]     *D & N Boening v. Kirsch Beverages*, 63 N.Y.2d 449, 453-54 (1984) (quotation marks and citations omitted).

[95]     *Id.*

[96]     N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2011).

> terms, or necessary construction, to endure for a longer period
> than one year, it is a valid agreement, although it may be capable
> of an indefinite continuance. . . .  Wherever an agreement has been
> found to be susceptible of fulfillment within that time, in whatever
> manner and however impractical, this court has held the one-year
> provision of the Statute to be inapplicable, a writing unnecessary,
> and the agreement not barred.[97]

"The law is well-settled that for a contract to fall within this provision of the

Statute of Frauds, there must be absolutely no possibility of performance of the

contract within one year."[98]

The New York State statute of frauds further provides that "a contract

to pay compensation for services rendered in negotiating a loan, or in negotiating

the purchase, sale, exchange, renting or leasing of any real estate or interest

therein, or of *a business opportunity* [is void unless it] be in writing."[99]  "'[W]here

. . . the intermediary's activity is . . . that of providing "know-how" or

"know-who", in bringing about between principals an enterprise of some

---

[97]     *D & N Boening*, 63 N.Y.2d at 454-55 (quotation marks and citations omitted) (emphasis added).

[98]     *Riley v. N.F.S. Serv., Inc.*, 891 F. Supp. 972, 975 (S.D.N.Y. 1995) (citing *Ohanian v. Avis Rent A Car Sys., Inc*., 779 F.2d 101, 106 (2d Cir. 1985) ("The one-year provision has been held not to preclude an oral contract unless there is 'not . . . the slightest possibility that it can be fully performed within one year.'") (quoting 2 Corbin on Contracts § 444, at 535)).  *Accord Morgenweck v. Vision Capital Advisors, LLC*, 410 Fed. App'x 400, 402 (2d Cir. 2011).

[99]     Gen. Oblig. Law § 5-701(a)(10) (emphasis added).

complexity or an acquisition of a significant interest in an enterprise,' the statute of frauds applies."[100]   However, the statute of frauds is inapplicable "where the duties of the party seeking enforcement go beyond mere negotiating or where the party seeking enforcement is a principal."[101]   Thus where the relationship between the parties is more "closely akin to that of [a] joint venture" no writing is required.[102]

## V.   DISCUSSION

### A.   The Agreement Could Have Been Performed Within One Year

It is undisputed that this controversy involves only an oral contract. Grace argues that this contract is unenforceable under the New York statute of frauds because it is essentially a "restrictive covenant[] not capable of being performed within one year."[103]   While indefinite restrictive covenants are indeed

---

[100]   *Snyder v. Bronfman*, 13 N.Y.3d 504, 510 (2009) (quoting *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 267 (1977)).

[101]   *Horizon Paper Co. v. Domtar Inc.*, No. 93 Civ. 5079, 1994 WL 97135, at *3 (S.D.N.Y. Mar. 21, 1994).

[102]   *See Dura v. Walker, Hart & Co.*, 27 N.Y.2d 346, 350 (1971).  *See also Sussex Leasing Corp. v. United States W. Fin. Serv., Inc.*, 877 F.2d 200, 203 (2d Cir. 1989); *Haskins v. Loeb Rhoades & Co.*, 52 N.Y.2d 523, 525 (1981) ("While it is true that . . . the agreement to share in the profits of the joint enterprise need not necessarily be in writing . . . this narrow exception to the Statute of Frauds applies only to a business enterprise 'closely akin to that of joint venture.'") (quoting *Dura*, 27 N.Y.2d at 350).

[103]   *Diversified Group., Inc. v. Daugerdas,* 139 F. Supp. 2d 445, 459 (S.D.N.Y. 2001).

subject to the statute of frauds, this only applies where the agreement cannot possibly be completed within a year.[104]  Restrictive covenants are generally barred under the statute of frauds where they are — by their own terms — indefinite, such as agreements that entitle a party to a fee or commission for as long as it sells or markets an item.[105]  In such cases, the statute of frauds applies because, although there is always a possibility that the agreement will cease to be relevant after a year — for instance if the parties die or no longer wish to market the item in question — these remote contingencies are considered more akin to a termination of the contract, rather than a performance.  However, where the contract itself "'include[s] an event which might end the contractual relationship of the parties within a year, defendant's possible liability beyond that time would not bring the

---

[104]     *See D & N Boening*, 63 N.Y.2d at 455 ("[T]his court has continued to analyze oral agreements to determine if, according to the parties' terms, there might be any possible means of performance within one year."); *see also North Shore Bottling Co. v. Schmidt & Sons*, 22 N.Y.2d 171, 175 (1968) ("[I]f the obligation of the contract is not, by its very terms, or necessary construction, to endure for a longer period than one year, it is a valid agreement, although it may be capable of an indefinite continuance.") (quotation marks and citations omitted).

[105]     *See Holloway v. King*, 361 F. Supp. 2d 351, 356-58 (S.D.N.Y. 2005) ("King's alleged obligations to share seventy percent of his promotion earnings with Tyson and the plaintiffs would continue indefinitely."); *Diversified*, 139 F. Supp. 2d at 459 (collecting cases); *D & N Boening*, 63 N.Y.2d at 455-56; *Grossberg v. Double H. Licensing Corp.*, 446 N.Y.S.2d 296, 297 (1st Dep't 1982) ("[D]efendants' liability endured so long as a single record of the Star Club performance was sold anywhere in the world."); *see also South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 105 (2d Cir. 2009).

contract within the statute.'"[106]

The Agreement in this case contemplated that Grace would "proceed with the Series only in the event that Caruso were retained and credited as an executive producer."[107]  Construing the pleadings in the light most favorable to Caruso, as this Court must, this Agreement could have been completed — not merely terminated — within one year, however unlikely such a prospect was. While Grace contends that the Agreement obligated Grace "not to host a syndicated television series unless Caruso is an executive producer . . . for the remainder of her life,"[108] this is not the only reading, or perhaps even the fairest reading, of Caruso's Complaint.  It is plausible to read the Complaint as referring to a single restriction on Grace preventing her from going ahead with a particular television series — one that might arise out of Grace's and Caruso's talks about a law-themed syndicated series — until and unless Caruso was extended a good faith offer to be executive producer.  This restriction was not, by necessity, of infinite duration.  Had CBS offered an executive producer position to Caruso and had

---

[106]     *Cron v. Hargro Fabrics*, 91 N.Y.2d 362, 370 (1998) (quoting *Martocci v. Greater N. Y. Brewery*, 301 N.Y. 57, 62 (1950)).

[107]     Compl. ¶ 21.

[108]     Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def. Mem.") at 10.

Grace proceeded with the show within a year of the Agreement, the contract would have been complete and all mutual obligations discharged.[109]  This constituted a plausible contingency, a one-time event contemplated by the parties, under which the Agreement would be completed within a year.[110]  Thus, despite the fact that the Agreement's restrictions *could have* endured indefinitely, this is not the only plausible reading of the Agreement, and indeed the more likely reading of Caruso's Complaint "states a plausible claim for relief."[111]

### B.   The Agreement Was Not a Contract to Pay for the Negotiation of

---

[109]    This conclusion is not inconsistent with the rule that a contract is still within the statute of frauds where only the plaintiff has the option to terminate within a year.  *See South Cherry*, 573 F.3d at 106.  Because Caruso would have had an obligation to accept the position of executive producer if offered to her, *see* Compl. ¶ 20, Caruso did not possess an option to end performance at that point.

[110]    *See North Shore*, 22 N.Y.2d at 176 (The statue of frauds "'does not apply to . . . cases in which the performance of the agreement depends upon a contingency which may or may not happen within the year.'") (quoting *Dresser v. Dresser*, 35 Barb. 573, 577 (Sup. Ct. N.Y. Co. 1862)); *see also Nakamura v. Fujii*, 677 N.Y.S.2d 113, 113 (1st Dep't 1998) ("The statute of frauds is not applicable to an agreement the performance of which depends on a contingency which may or may not happen within one year.").

[111]    *Iqbal*, 129 S. Ct. at 1950.  I find no merit, however, in Caruso's argument that the Agreement could have been discharged within a year by Grace deciding not to host the Series, *see* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss at 17.  Inasmuch as this would have constituted a violation of the Agreement, *see* Compl. ¶ 21, there is no question that "[a] breach can in no way be equated with an option to discontinue or cancel, the exercise of which would constitute an alternative performance of the agreement."  *D & N Boening*, 63 N.Y.2d at 456.

### a Business Opportunity

Grace further argues that the Agreement is barred under the statute of frauds because by agreeing to promote and develop the Series, Caruso was involved in the negotiation of a business opportunity. While Grace is correct that Caruso's actual duties in setting up the Series fall into the broad definition that courts have given to negotiating a business opportunity,[112] the Agreement is not barred because Caruso did not enter into an agreement for compensation for her services.[113]

The statute of frauds' bar against oral contracts concerning the negotiation of business opportunities applies where plaintiffs demand compensation for past work in such roles.[114] The Agreement in this case, however, did not contemplate any form of compensation from Grace to Caruso; rather, they

---

[112]   *See Gutkowski*, 680 F. Supp. 2d at 613 ("'Courts interpreting section (a)(10) have generally held that where the transaction results in the acquisition of an existing enterprise or the formation of a new one, it is a business opportunity.'") (quoting *Management Recruiters of Boulder v. National Econ. Research Assocs. Inc.*, No. 02 Civ. 3507, 2006 WL 2109478, at *6 (S.D.N.Y. July 24, 2006)).

[113]   *See* Compl. ¶¶ 20-21.

[114]   *See, e.g.*, *Gutkowski*, 680 F. Supp. 2d at 613 ("Plaintiff is seeking compensation for services that are easily encompassed by this definition."); *Snyder*, 13 N.Y.3d at 509 ("In seeking reasonable compensation for his services, plaintiff obviously seeks to be compensated for finding and negotiating the Warner Music transaction.").

agreed that Grace would host the series "only in the event that Caruso were retained and credited as an executive producer."[115]  The contract, thus construed, falls outside the scope of the statute of frauds.  Grace contends that the Agreement should nevertheless be barred inasmuch as it represents an end-run around the statute.[116]  While I appreciate the creativity of Grace's argument, statutory construction is not that flexible.[117]  Furthermore, resolving all ambiguities in favor of Caruso, it is plausible that the Agreement was akin to a joint venture, and not an agreement providing for the compensation of Caruso for her efforts.[118]  In any event, whether this is a contract for the negotiation of a business opportunity — wherein Caruso would be compensated for her past efforts — or a joint venture is a question of fact that must be explored during the discovery process.  Accordingly, Grace has failed to show that Caruso's Complaint must be dismissed as a matter of

---

[115]    Compl. ¶ 21.

[116]    *See* Defendant's Reply Memorandum in Support of Its Motion to Dismiss at 10.

[117]    Although the Complaint does address compensation, *see* Compl. ¶ 75, the reference concerns the proper measure of damages in this case rather than a term of the Agreement.  Also, despite the fact that the parties' attorneys mentioned compensation, *see* Compl. ¶ 50, it was not a term in the Agreement.

[118]    *See Dura*, 27 N.Y.2d at 350 ("Here, the plaintiff is suing not an employer or principal for a fee but a fellow finder for a portion of a fee already received by the latter, on the strength of an agreement by the two of them that they pool their efforts and share the benefits.").

law under the statute of frauds.

### C.   The Agreement Was Not Indefinite With Respect to Material Terms

Grace asserts that the Agreement is unenforceable as a matter of law because it contained material terms that were never defined.  Specifically, Grace contends that the following terms were not defined:  (1) "executive producer;" (2) compensation for Caruso; and (3) the duration of the Agreement.  In short, Grace claims that the Agreement was merely an agreement to agree.[119]  The parties do not dispute that material terms must be defined for a contract to be valid and that titles, compensation and duration of an agreement constitute material terms of a contract.  What the parties dispute in this action, is the application of these principles to the Agreement.

Regarding the position of "executive producer," Caruso maintains that this role is "uniformly recognized in the television industry."[120]  Caruso also lists the specific duties and responsibilities of an executive producer.[121]  Caruso's pleadings thus provide more than threadbare legal conclusions that the term "executive producer" has a uniform meaning within the industry, and that Grace

---

[119]    *See* Def. Mem. at 16 (citing *Joseph Martin*, 52 N.Y.2d at 109).

[120]    Compl. ¶ 22.

[121]    *See id.*

and Caruso reached a mutual understanding regarding this term at their initial conference.  At this early stage in the proceeding, I cannot say as a matter of law that the position of executive producer was not defined.

With respect to compensation, Caruso claims that no agreement was necessary because the Agreement did not obligate Grace to provide any compensation.  In fact, the Agreement only provides that Grace would not proceed with the Series unless Caruso were made executive producer.[122]  Grace seeks to overcome this obstacle by claiming that without any clarification of what the parties intended as compensation, they could never agree on what would constitute an offer to retain and credit Caruso as executive producer.[123]  However, given that Caruso has alleged industry-wide duties as well as compensation for executive producers,[124] it is plausible that the Agreement was not vague.[125]  Furthermore, it is reasonable to infer from the Complaint that Caruso was interested in the position of executive producer not just for the compensation involved, but also for the credit

---

[122]    *See id.* ¶ 21.

[123]    *See* Def. Mem. at 19.

[124]    *See* Compl. ¶¶ 22, 75.

[125]    *See Cobble Hill*, 74 N.Y.2d at 483 ("[A] method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage.").

and recognition that comes with holding such a position.[126]  Thus, drawing every

inference in Caruso's favor as I must, the terms of the Agreement are sufficiently

stated such that the claim may proceed.

   The failure to state the duration of an agreement is also a material

term in a contract whose absence can render an agreement unenforceable.[127]

Nonetheless, courts should not strictly apply the doctrine of indefiniteness, and its

use should be "at best a last resort."[128]  This Agreement does not involve a specific

act or performance that would require a precise duration or timeline.  Instead, the

Complaint suggests that Grace and Caruso began to work "[i]mmediately after the

Jubilee meeting, and continuously thereafter" in order to bring their idea to

fruition.[129]  While the Complaint fails to allege any deadlines or timelines, it

plausibly suggests that Grace and Caruso agreed to, and did, begin work on

developing their proposal for a syndicated television series and bring it to a

network at the earliest possible time.  Based on the Agreement and the attendant

---

[126] *See* Compl. ¶ 79.

[127] *See Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 292 (E.D.N.Y 1998).

[128] *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991) (citing *Cobble Hill*, 74 N.Y.2d at 483 and *Cohen & Sons v. Lurie Woolen Co.*, 232 N.Y. 112, 114 (1921)).

[129] *See* Compl. ¶ 24.

circumstances, it is plausible "that the parties intended to be bound" by the terms upon which they did agree.[130]

        Finally, Grace insists that the Agreement in question is so lacking in definiteness that it constitutes nothing more than "a mere agreement to agree."[131] Taking the Agreement as stated by Caruso, however, its content is clear.  In an agreement to agree, the parties, rather than agreeing on the terms of their bargain, simply agree "to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework."[132]  The essence of an agreement to agree is the intent of the parties to finalize the substance — or substantive portions — of their agreement in the future.[133]  The Agreement here, however, includes the

---

[130]    *166 Mamaroneck*, 78 N.Y.2d at 91.  *Accord Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999) ("[N]ot all terms of a contract need be fixed with absolute certainty."); *May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 264 (1943) ("[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement.").

[131]    *Joseph Martin*, 52 N.Y.2d at 109.  *Accord Adjustrite Sys., Inc. v. GAB Bus. Serv., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998) ("Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract.").

[132]    *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

[133]    For example, the lease in *Joseph Martin*, 52 N.Y.2d at 108, provided that "(t)he Tenant may renew this lease for an additional period of five years at annual rentals to be agreed upon."

type of television show that Grace and Caruso were to work on ("a law-themed syndicated series"), the specific positions the parties would hold ("executive producer" and "host"), and particular steps to be taken ("market[ing]" and "development").[134]  Given such specificity in their design as well as the developing nature of the series they were working on, Caruso's alleged version of the Agreement includes a more focused and specific bargain than a mere agreement to agree.  Because the Agreement is not so vague and indefinite as to render it unenforceable, Grace's motion to dismiss is denied.

> **D.    Caruso's Arguments Do Not Merit Sanctions**

As the previous discussion makes clear, Caruso's Complaint, with all plausible inferences drawn in her favor, states a claim as a matter of law.  Caruso's claims, therefore, are not frivolous, and this Court declines to impose sanctions.

## VI.    CONCLUSION

For the foregoing reasons, defendant's motion to dismiss and motion for sanctions are denied.  The Clerk is directed to close these motions [Docket Nos. 6 and 10].  A conference is hereby scheduled for October 20, 2011 at 3:30 p.m. The parties are instructed to bring a proposed scheduling order to the conference in accordance with the Court's individual rules.

---

[134]    *See* Compl. ¶¶ 20-21.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             September 27, 2011

**- Appearances -**

**For Plaintiff:**

Gregory A. Clarick, Esq.
Nicole L. Gueron, Esq.
Isaac Berkman Zaur, Esq.
Clarick Gueron Reisbaum LLP
40 West 25th Street
New York, NY 10010
(212) 633-4313/ 4310

**For Defendant:**

Erik Randall Zimmerman, Esq.
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8690

Orin Snyder, Esq.
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166
(212) 351-2400